UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| MARATHON OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, the United States of America, by authority of the Attorney General of the United States and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") files this Complaint and alleges as follows:

### NATURE OF ACTION

1.      This is a civil action against Marathon Oil Company ("Marathon" or "Defendant") for violations of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. § 7401 *et seq.*, at Marathon's oil and natural gas production facilities within the boundaries of the Fort Berthold Indian Reservation ("FBIR") in west-central North Dakota.

2.      At issue in this case are two categories of violations:

    (a)      **Design, operation, and maintenance violations.** Marathon failed to meet requirements for design, operation and/or maintenance at no fewer than 66 oil and gas production facilities, leading to unlawful emissions of volatile organic

compounds ("VOCs") and other air pollutants. These violations are of requirements set forth in the Federal Implementation Plan for Oil and Natural Gas Production Facilities, Fort Berthold Indian Reservation, North Dakota ("Fort Berthold FIP") 40 C.F.R. §§ 49.4161-4168, and Standards of Performance for Crude Oil and Natural Gas Production, Transmission and Distribution under 40 C.F.R. part 60, Subparts OOOO and OOOOa ("NSPS Subpart OOOO" and "NSPS Subpart OOOOa"); and

(b)     **Permitting violations**. Marathon failed to obtain required pre-construction and/or operating permits for at least 38 oil and gas production facilities. To avoid permitting requirements, Marathon submitted artificially low estimates for VOC and carbon monoxide ("CO") emissions to EPA based on erroneous and unreasonable assumptions. In reality, Marathon's facilities collectively emitted thousands more tons of pollutants per year than the estimates provided to EPA. These violations are of pre-construction permit requirements set forth in Part C of Title I of the CAA, 42 U.S.C. §§ 7470-92, and its implementing regulations for the Prevention of Significant Deterioration ("PSD") at 40 C.F.R. § 52.21; and of operating permit requirements set forth in Section 502 of the CAA, 42 U.S.C. §§ 7661–7661f ("Title V"), and its implementing regulations for federal operating permits at 40 C.F.R. Part 71.

3.     Marathon's facilities have unlawfully emitted thousands of tons of VOCs, CO, methane, and other pollutants into the atmosphere because of its violations.

4.     The United States seeks injunctive relief and civil penalties under Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, based on Marathon's violations of the

CAA and its implementing regulations.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

6.     Venue is proper in this District under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because Defendant conducts business in this District, and the violations constituting the basis for this Complaint occurred in this District.

## AUTHORITY AND NOTICE

7.     The United States has authority to bring this action under 28 U.S.C. §§ 516, 519 and Section 305 of the CAA, 42 U.S.C. § 7605.

8.     EPA issued three separate Notices and Findings of Violation to Marathon that encompass the violations alleged in this Complaint.  EPA has provided copies of the Notices to the State of North Dakota.

9.     Thirty days have passed since the Notices in the preceding paragraph were issued.

10.    The United States will provide notice of the commencement of this action to the State of North Dakota, as required by Section 113(b) of the Act, 42 U.S.C. § 7413(b).

## DEFENDANT

11.    Marathon is a domestic corporation incorporated in the State of Ohio.

12.    Marathon's corporate headquarters are located at 5555 San Felipe Street, Houston, Texas, 77056-2723.

13.    Marathon is a publicly held company engaged in oil and gas production and exploration.

14.     Marathon is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

15.     Marathon has at all times relevant to this action done business in the State of North Dakota as an upstream oil and natural gas producer.

16.     Marathon is directly involved in operating the oil and natural gas production facilities at issue (the "Facilities") (listed in Appendices A-C).

17.     Marathon is the owner or operator of the Facilities within the meaning of the Clean Air Act.

## STATUTORY AND REGULATORY BACKGROUND

18.     The primary purpose of the Act is to protect and enhance the quality of the Nation's air to promote the public health and welfare and the productive capacity of the population. 42 U.S.C. § 7401(b)(1).

19.     This case involves violations of four programs designed to further the Act's primary purpose: National Ambient Air Quality Standards ("NAAQS") and Federal Implementation Plans ("FIPs"); Prevention of Significant Deterioration; New Source Performance Standards; and Title V Operating Permits.

### A.  NAAQS and FIPs

20.     The Act directs EPA to identify air pollutants that "may reasonably be anticipated to endanger public health or welfare" and to issue air quality criteria based on "the latest scientific knowledge" about the effects of the pollutants on public health and the environment. 42 U.S.C. § 7408. These pollutants are known as "criteria pollutants." 42 U.S.C. § 7409.

21.     This case involves two criteria pollutants: ozone and CO.

22.     Ozone is not emitted directly from sources of air pollution. Ozone is a

photochemical oxidant, formed when certain chemicals in the ambient air react with oxygen in the presence of sunlight. These chemicals – VOC and nitrogen oxides (NOx) – are called "ozone precursors." Sources that emit ozone precursors are regulated to reduce ground-level ozone. *See* 62 Fed. Reg. 38,856 (July 18, 1997).

23.     The Act requires EPA to establish primary and secondary NAAQS for criteria pollutants. 42 U.S.C. § 7409. The primary standard must be set at a level "requisite to protect the public health" with an adequate margin of safety, and the secondary standard is intended to protect "the public welfare" from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air. *Id*.

24.     Under the Act, tribes may develop and submit to EPA implementation plans to meet and maintain NAAQS in Indian Country. 42 U.S.C. §§ 7410(o), 7601(d).

25.     Where, as here, a tribal implementation plan has not been approved, EPA has the authority to issue a FIP applicable to Indian Country to ensure compliance with NAAQS. *See* 42 U.S.C. §§ 7601(a), 7601(d).

26.     There are two FIPs relevant to this case: the Fort Berthold FIP, and the federal minor new source review program in Indian Country (the "Tribal Minor NSR Rule").

>                *i.*     *Fort Berthold FIP*

27.     EPA finalized the Fort Berthold FIP in 2013. 78 Fed. Reg. 17,836 (Mar. 22, 2013). The Fort Berthold FIP ensures compliance with the NAAQS for ozone. 40 C.F.R. §§ 49.4161-49.4168.

28.     The Fort Berthold FIP "establish[es] legally and practicably enforceable requirements to control and reduce VOC emissions from well completion operations, well recompletion operations, production operations, and storage operations at existing, new and

modified oil and natural gas production facilities." 40 C.F.R. § 49.4161(a).

        *ii.*    *Tribal Minor NSR Rule*

29.     EPA finalized the FIP for new and modified minor sources in Indian Country in 2011. 76 Fed. Reg. 38748 (July 1, 2011). This rule created two new source review ("NSR") regulations for the protection of air quality in Indian Country, including the Tribal Minor NSR Rule.

30.     The Tribal Minor NSR Rule establishes a preconstruction permitting program for new and modified minor sources and minor modifications at major sources located in Indian Country. 40 C.F.R. § 49.151(b)(1).

31.     The Tribal Minor NSR Rule also creates a registration program for true minor sources located in Indian Country. 40 C.F.R. § 49.160.

32.     The registration program requires owners and operators of true minor sources that commence construction or modification of a source on or after October 3, 2016, to submit a Part 1 Registration Form 30 days before the beginning of construction. 40 C.F.R. § 49.160(c)(iv).

33.     Within 30 days after the startup of production, the owner or operator of the source must determine the potential for emissions, within 60 days after startup of production, the owner or operator of the source must submit a Part 2 Registration Form. *Id.*

34.     The Part 2 Registration program only applies to owners and operators of true minor sources. 40 C.F.R. § 49.10(a). A true minor source is a source whose potential to emit regulated pollutants is less than the applicable major source threshold without the need to take an enforceable restriction to reduce its potential to emit to such levels. 40 C.F.R. § 49.152(d)(1)(ii)(3)(iii)(4). For VOCs and CO, the applicable major source threshold is 250 tons per year ("tpy"). 40 C.F.R. § 49.152(d) (citing 40 C.F.R. §§ 49.167, 52.21, 71.2).

35.     The Tribal Minor NSR Rule works together with the pre-existing PSD program and the Title V operating permits program to "provide a comprehensive permitting program to ensure that air quality in Indian Country will be protected in the manner intended by the Act." 79 Fed. Reg. 31035, 31037 (May 30, 2014).

**B.  Prevention of Significant Deterioration Program**

36.     After EPA sets a new NAAQS or revises an existing NAAQS, EPA, considering state recommendations, determines whether areas meet the air quality standards. These determinations generally are based on data collected from air quality monitors located within the considered relevant area. *See* 40 C.F.R. § 58.2.

37.     Areas where the air quality falls short of national standards are designated as "non-attainment areas." Areas where air quality meets the standards are called "attainment areas." Areas for which data is lacking are designated "unclassifiable" and generally have the same obligations as attainment areas (unless they are later re-designated "nonattainment"). *See* 42 U.S.C. § 7407(d).

38.     Air quality planning and control requirements differ for nonattainment and attainment areas. *See generally* 42 U.S.C. §§ 7501 – 7504; 7470 – 7492.

39.     For areas that are in attainment with NAAQS, the Act sets forth requirements for the prevention of significant deterioration of air quality (the "PSD Program"). 42 U.S.C. §§ 7470-7492. These requirements are designed to protect the public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision-making process. 42 U.S.C. § 7470.

40.     The PSD program applies in this case because the Facilities are in areas designated as unclassifiable/attainment for the relevant ozone and CO NAAQS.

41.     The PSD Program prohibits any "major emitting facility" from being constructed in areas designated as attainment or unclassifiable with the NAAQS unless a permit has been issued and the facility employs the "best available control technology" ("BACT") for each pollutant subject to regulation under the Act emitted from the facility. 42 U.S.C. §§ 7475(a)(1) – (4); 7479(1)-(3); *see also* 40 C.F.R. § 52.21(a)(2).

42.     EPA has promulgated federal regulations implementing the PSD program at 40 C.F.R. § 52.21. Federal regulations implementing the PSD program apply in this case because the Facilities are all located on an Indian reservation in a state whose approved SIP incorporates the federal PSD regulations. 40 C.F.R. § 52.21(a); *see also* 40 C.F.R. § 52.1829(a), (b).

43.     The federal PSD regulations "apply to the construction of any new major stationary source or any project at an existing major stationary source in an area designated as attainment or unclassifiable under Sections 107(d)(1)(A)(ii) or (iii) of the [CAA]." 40 C.F.R. § 52.21(a)(2)(i).

44.     A "major emitting facility" is any source "with potential to emit two hundred and fifty [tpy] or more of any pollutant," including VOCs and CO. 42 U.S.C. § 7479(1).

45.     A "major stationary source" includes "any stationary source which emits, or has the potential to emit, 250 [tpy] or more of a regulated NSR pollutant." 40 C.F.R. § 52.21(b)(1)(i)(b).

46.     A "major stationary source" also includes "[a]ny physical change that would occur at a stationary source . . . if the change would constitute a major stationary source by itself." 40 C.F.R. §§ 52.21(b)(1)(i)(c).

47.    40 C.F.R. § 52.21(b)(50) defines "regulated NSR pollutant" as, among other things, any pollutant for which a NAAQS has been promulgated.

48.    "BACT" is defined, in part, as "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable from such facility. . . In no event shall application of [BACT] result in emissions of any pollutants which shall exceed the emissions allowed any applicable standard established pursuant to section [7411] . . . of this Act." 42 U.S.C. § 7479(3); *see also* 40 C.F.R. § 52.21(b)(12).

### C.  New Source Performance Standards

49.    The Act also requires EPA to promulgate standards of performance applicable to "new sources" within categories of stationary sources that cause "air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b). These regulations are referred to as New Source Performance Standards ("NSPS").

50.    It is unlawful for owners or operators of any new source to operate in violation of the NSPS after the effective date of the standards. 42 U.S.C. § 7411(e).

51.    In 1979, EPA listed "Crude Oil and Natural Gas Production" as a source category that contributes significantly to air pollution and for which standards of performance would be established. 44 Fed. Reg. 49,222 (Aug. 21, 1979).

52.    This case involves two related New Source Performance Standards for crude oil and natural gas production: 40 C.F.R. Part 60, Subparts OOOO and OOOOa.

*i.    NSPS Subpart OOOO*

53.     In 2012, EPA issued NSPS regulations for the crude oil and natural gas production, transmission, and distribution industry sector. 77 Fed. Reg. 49,542 (Aug. 16, 2012). These standards were codified at 40 C.F.R. Part 60, Subpart OOOO.

54.     NSPS Subpart OOOO establishes emission standards and compliance schedules for the control of VOCs and sulfur dioxide emissions. 40 C.F.R. § 60.5360.

55.     NSPS Subpart OOOO applies to affected facilities for which owners or operators commence construction, modification, or reconstruction after August 23, 2011, and on or before September 18, 2015. *Id.*

56.     Among the affected facilities subject to NSPS Subpart OOOO are "storage vessel affected facilit[ies]." 40 C.F.R. § 60.5365(e). A "storage vessel affected facility" is a single storage vessel with the potential for VOC emissions equal to or greater than 6 tpy as determined according to 40 C.F.R. § 60.5365(e).

57.     NSPS Subpart OOOO defines "storage vessel" as a tank or other vessel that contains an accumulation of crude oil, condensate, intermediate oil, or produced water, and that is constructed primarily of non-earthen materials (such as wood, concrete, steel, fiberglass, or plastic) which provide structural support. 40 C.F.R. § 60.5430.

58.     NSPS Subpart OOOO requires "[a]t all times, including periods of startup, shutdown, and malfunction, owners and operators shall maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions." 40 C.F.R. § 60.5370(b).

59.     NSPS Subpart OOOO sets forth storage vessel cover and closed vent system requirements that applicable facilities must meet.  40 C.F.R. § 60.5411.

60.     For storage vessels constructed, modified, or reconstructed after August 23, 2011, and on or before April 12, 2013, owners and operators were required to submit a notification identifying each storage vessel affected facility in an initial annual report by July 14, 2015. The initial report must include documentation of the VOC emission rate determination and records of deviations in cases where the storage vessel affected facility was not operated in compliance with the requirements specified in 40 C.F.R. §§ 60.5395, 60.5411, 60.5412, and 60.5413, as applicable. 40 C.F.R. §§ 60.5410(h)(4), 60.5420(b), 60.5420(c)(5)(iii).

61.     For storage vessels constructed, modified, or reconstructed after April 12, 2013, and on or before September 18, 2015, owners and operators must demonstrate initial compliance by April 15, 2014, or within 60 days after startup, whichever is later. Within 90 days after the end of the initial compliance period, owners and operators must submit an initial annual report that identifies the storage vessel affected facilities constructed, modified, or reconstructed during the reporting period and includes documentation of the VOC emission rate determination and records of deviations in cases where the storage vessel affected facility was not operated in compliance with the requirements specified in 40 C.F.R. §§ 60.5395, 60.5411, 60.5412, and 60.5413, as applicable. 40 C.F.R. §§ 60.5410(h)(4), 60.5420(b), 60.5420(c)(5)(iii).

62.     After the initial report, owners and operators must submit annual reports identifying the storage vessel affected facilities constructed, modified, or reconstructed during the reporting period. Annual reports must include documentation of the VOC emission rate determination and records of deviations in cases where the storage vessel affected facility was not operated in compliance with the requirements specified in 40 C.F.R. §§ 60.5395, 60.5411, 60.5412, and 60.5413, as applicable. 40 C.F.R. §§ 60.5420(b)(6), 60.5420(c)(5)(iii).

*ii.   NSPS Subpart OOOOa*

63.     In 2016, EPA made amendments to the 2012 NSPS for the crude oil and natural gas production, transmission, and distribution industry sector. 81 Fed. Reg. 35,898 (June 3, 2016). These standards were codified at 40 C.F.R. Part 60, Subpart OOOOa.

64.     NSPS Subpart OOOOa applies to affected facilities for which owners or operators commence construction, modification or reconstruction after September 18, 2015. 40 C.F.R. § 60.5360a.

65.     Like NSPS Subpart OOOO, among the affected facilities subject to NSPS Subpart OOOOa are "storage vessel affected facilit[ies]." 40 C.F.R. § 60.5365a(e). A "storage vessel affected facility" is a single storage vessel with the potential for VOC emissions equal to or greater than 6 tpy as determined according to 40 C.F.R. § 60.5365a(e).

66.     NSPS Subpart OOOOa also requires "[a]t all times, including periods of startup, shutdown, and malfunction, owners and operators shall maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions." 40 C.F.R. § 60.5370a(b).

67.     NSPS Subpart OOOOa sets forth storage vessel cover and closed vent system requirements that applicable facilities must meet.  40 C.F.R. § 60.5411a.  For each storage vessel affected facility, owners and operators must demonstrate initial compliance by August 2, 2016, or within 60 days after startup, whichever is later. 40 C.F.R. § 60.5410a(h). The period ends no later than one year after the initial startup date or no later than one year after August 2, 2016. 40 C.F.R. § 60.5410a. Within 90 days after the end of the initial compliance period, owners and operators must submit an initial annual report that includes the identification and location of each storage vessel affected facility constructed, modified, or reconstructed during the reporting

period, documentation of the VOC emission rate determination, records of deviations in cases where the storage vessel affected facility was not operated in compliance with the requirements specified in 40 C.F.R. §§ 60.5395a, 60.5411a, 60.5412a, and 60.5413a, as applicable, and a statement indicating requirements specified in 40 C.F.R. § 60.5410a(h)(2) and (3) have been met. 40 C.F.R. §§ 60.5410a(h)(5), 60.5420a(b), 60.5420a(c)(5)(iii).

### D.  Title V Operating Permit Requirements

68.     All major pollution sources must apply for and operate pursuant to operating permits that assure compliance with all their Clean Air Act requirements. These provisions are often referred to as "Title V." 42 U.S.C. §§ 7661-7661f.

69.     The purpose of Title V is to incorporate all "applicable requirements" that apply to a source regulated under the Act into one permit. 42 U.S.C. § 7661c(a).

70.     Title V establishes a permit program for any "major source" or a major stationary source required to have a PSD permit. 42 U.S.C. § 7661a(a).

71.     Under Title V, a "major source" includes any stationary source that is either a "major source" as defined in Section 112 of the CAA, 42 U.S.C. § 7412, or a "major stationary source" as defined in Section 302(j) of the CAA, 42 U.S.C. § 7602(j). 42 U.C.S. § 7661(2).

72.     Section 302(j) of the CAA, 42 U.S.C. § 7602(j), defines "major stationary source" as "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred [tpy] or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)."

73.     In accordance with Section 502(b) of the Act, 42 U.S.C. § 7661a(b), EPA issued regulations implementing Title V of the Act. Federal Operating Permits Program, 61 Fed. Reg. 34228 (July 1, 1996). Those regulations are codified at 40 C.F.R. Part 71.

74.     The Act requires EPA to administer and enforce an operating permit program in Indian Country. 42 U.S.C. § 7661a(a); 40 C.F.R. § 71.4(b). The effective date of the Part 71 program in Indian Country is March 22, 1999.

75.     No source subject to Title V may operate except in compliance with a Title V operating permit ("Title V Permit"). 42 U.S.C. § 7661a(a); 40 C.F.R. § 71.7(b).

### E.  Enforcement Provisions

76.     The Act provides that the Administrator may bring a civil action whenever, on the basis of any information available, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of, among other things (1) an applicable federal implementation plan; (2) New Source Performance Standards; (3) the PSD program; and (4) the Title V permitting program. 42 U.S.C. § 7413(a).

77.     The Act authorizes EPA to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day for each violation, a figure that has been updated for inflation over time. 42 U.S.C. § 7413(b).

78.     As relevant here, the maximum penalty is $37,500 per violation for each day of violation that occurred before November 2, 2015, and $117,468 per violation for each day of violation that occurred after November 2, 2015, and assessed on or after January 6, 2023. *See* Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701; 40 C.F.R. § 19.4; 88 Fed. Reg. 986 (Jan. 6, 2023).

79.     In addition, the Act authorizes EPA to initiate an action for injunctive relief as necessary to prevent the construction, modification, or operation of a major emitting facility which does not conform to the PSD requirements in Part C of Title I of the Act. 42 U.S.C. § 7477.

## GENERAL ALLEGATIONS

### A.  Facility Processes

80.     Marathon owns and operates oil and natural gas production facilities in the Bakken region in North Dakota.

81.     At all times relevant to this Complaint, Marathon owned and/or operated each of the Facilities.

82.     The Facilities produce a mixture of oil, natural gas, and produced water. This mixture flows up the well under pressure to the well-head at the surface and then to separation equipment.

83.     The purpose of the separation equipment is to separate the effluent from the well into its constituent parts: hydrocarbon liquids, natural gas, and produced water. The separation equipment varies by facility and may consist of one of more components, including a three-phase separator, heater-treater, and vapor recovery tower.

84.     Once separated from the oil and produced water, natural gas is either transferred into a sales pipeline or sent to a flare (the "treater gas flare"). Flares are intended to burn gas as a means of disposal, a process known as "flaring."

85.     Once separated from the natural gas, the oil and produced water are temporarily held under pressure in the separation equipment until the liquids reach a set volume level, at which point valves open and the liquids flow into storage vessels, which are kept at or near atmospheric pressure.

86.     When pressurized oil is transferred to atmospheric storage vessels, some of the hydrocarbons in the oil, including VOCs and hazardous air pollutants ("HAPs"), vaporize in a phenomenon known as "flashing." After flashing occurs, the oil continues to emit vapors due to

liquid level changes and temperature fluctuations.

87.     Storage vessels are equipped with openings called "thief hatches" or "pressure relief valves" ("PRVs") that are designed to open (or "vent") as needed to relieve pressure or provide access to the tank contents, and to seal tightly when closed. Thief hatches and PRVs are collectively known as pressure relief devices ("PRDs").

88.     Generally, properly maintained PRDs do not vent emissions to the atmosphere during normal operations, except when the PRD is actively being used (for example, for tank gauging, inspections, and maintenance).

89.     Vapors collect in the storage vessel head space and are then piped through a closed vent system to a dedicated flare. The storage vessels, control devices (e.g., flares), vent lines, and all connections, fittings, PRDs, and any other appurtenances used to contain, collect, and convey vapors are collectively known as the Vapor Control System ("VCS").

90.     A well-maintained VCS captures and routes vapors through a series of pipes or vent lines either to a flare or to process through a vapor recovery unit, where vapors are recycled or recovered.

91.     After separation, oil is transferred to a sales pipeline.

92.     Produced water from oil and natural gas production facilities in North Dakota is primarily trucked offsite and pumped into empty formations known as "saltwater disposal wells."

93.     Marathon is required to submit monthly reports containing the amount of oil produced and the amount of flaring to the North Dakota Industrial Commission ("NDIC").

94.     Below is a diagram from a Marathon Part 2 registration showing the production process at a typical Marathon facility.



**B. Impacts to Human Health and the Environment**

95. Marathon's Facilities emit thousands of tons of pollutants per year into the air, including VOCs, carbon monoxide, and methane.

96. Flares at just one Marathon facility burned more than 2 billion standard cubic feet ("SCF") of gas in 12 months. This amount is greater than the amount of gas flared across the entire State of Colorado for calendar year 2021.

97. There are two primary sources of emissions at Marathon's Facilities.

98. First, an insufficiently designed or poorly maintained and operated VCS result in VOC and methane emissions from the systems directly to the atmosphere during normal operations.

99. Second, flaring at the Facilities results in significant emissions of VOC, methane,

and carbon monoxide. This occurs in two ways:

       (a)  Produced natural gas is routed to unlit flares, resulting in a full release of VOCs and methane; and

       (b)  Produced natural gas is routed to lit flares, which reduces the VOC and methane emissions but results in emissions of CO.

100.    VOCs and CO are both criteria pollutants for which EPA has promulgated national standards, due to their adverse effects on human health and the environment.

101.    Methane is a hydrocarbon and the primary component of natural gas that EPA has identified as one of four primary contributors to U.S. greenhouse gas emissions.

102.    VOCs are a precursor to ground-level ozone, often referred to as "smog." VOCs form ground-level ozone by reacting with sources of oxygen molecules, e.g., nitrogen oxides and CO, in the atmosphere in the presence of sunlight.

103.    Ground-level ozone can cause temporary breathing difficulty for people with asthma, airway inflammation, and even permanent scarring of lung tissue from repeated exposure. People with lung disease, children, older adults, and people who are active outdoors may be particularly sensitive to ozone.

104.    Children are at greatest risk from exposure to ozone because their lungs are still developing and they are more likely to be active outdoors when ozone levels are high, which increases their exposure. Children are also more likely than adults to have asthma.

105.    Ozone can also reduce growth of certain trees, cause visible injury to plant leaves, and, over time, lead to increased susceptibility of sensitive plant species to disease, damage from insects, effects of other pollutants, competition, and harm from severe weather.

106.    These plant-level effects can ultimately result in adverse impacts on entire

ecosystems, including loss of species diversity and changes to habitat quality and water and nutrient cycles.

107.    The most significant impacts from CO exposure are cardiovascular related. Short and long-term CO exposures impact central nervous system function, birth outcomes, and developmental effects.

108.    The populations most at risk from CO exposure are those with pre-existing cardiovascular disease who cannot compensate for reduced oxygen levels, which occurs when CO displaces oxygen. Other at-risk populations include individuals with diabetes, anemia, older adults, fetuses at certain developmental stages, and young infants and newborns.

109.    Methane accounts for approximately 11% of all U.S. greenhouse gas emissions that derive from human activities. Methane has an impact 25 times greater than carbon dioxide over a 100-year period.

### C.  Facility Inspections

110.    On April 1, 2015, inspectors from EPA conducted onsite inspections of Marathon oil and natural gas facilities using an optical gas-imaging infra-red camera ("IR camera"). EPA inspectors evaluated compliance with the Fort Berthold FIP at 24 facilities ("2015 Inspected Facilities").

111.    Inspectors observed and documented unlawful emissions at 10 of the well pads evaluated, in violation of 40 C.F.R. § 49.4165(b). The 10 facilities where inspectors observed emissions are listed in Table 1.

| Table 1. Marathon Facilities with Violations Observed During Inspections on April 1, 2015 | |
| --- | --- |
| **Facility Name** | **Emissions Observed** |
| Henry Charging USA 31-3TFH | Emissions from multiple PRDs on top of storage tanks |

| Raymond USA 41-4H | Emissions from PRD on top of at least one storage tank |
| Sloan 34-32H | Emissions from PRD on top of storage tank |
| Fisher USA 21-5H | Emissions from multiple PRDs on top of storage tanks |
| Keith 44-31TFH | Emissions from PRDs on top of storage tanks |
| Jay Sandstrom USA 34-31H | Emissions from thief hatch on top of storage tank |
| Everett Fisher USA 31-6H | Emissions from PRDs on top of storage tanks |
| Red Feather USA 21-17H | Emissions from PRD on top of storage tank |
| William USA 31-2TFH/31-2H | Emissions from PRDs on top of storage tanks |
| Skogstad 41-28H | Emissions from PRV on top of storage tank |

112.     On October 8, 2019, inspectors from EPA conducted a second set of onsite inspections of Marathon oil and natural gas facilities using an IR camera. EPA inspectors evaluated compliance with the Fort Berthold FIP at 11 oil and natural gas production facilities ("2019 Inspected Facilities"). EPA inspectors conducted the October 8, 2019, inspections jointly with the Energy Division of the Three Affiliated Tribes of the Mandan Hidatsa and Arikara Nations.

113.     Inspectors observed and documented unlawful emissions at five of the well pads evaluated, in violation of 40 C.F.R. § 49.4165(b). The five facilities where inspectors observed emissions are listed in Table 2.

| Table 2. Marathon Facilities with Violations Observed During Inspections on October 8, 2019 | |
|---|---|
| **Facility Name** | **Emissions Observed** |
| Moline 14-32H, Lacey USA 11-5H | Emissions from thief hatch on top of storage tank |
| Cummings CTB USA (41-6H, 6TFH, 44-31TFH) | Emissions from PRDs on top of storage tanks |
| Rhoda Pad: Oren USA 31-6TFH and Rhoda 24-31H | Emissions from PRDs on top of storage tanks |
| Tara Jo USA 34-12TFH, 12H | Emissions from PRDs on top of storage tanks |
| Jessica USA 21-6TFH, Everett Fisher USA 31-6H | Emissions from PRDs on top of storage tanks |

114.     On August 19, 2020, inspectors from EPA conducted a third set of onsite

inspections of Marathon oil and natural gas facilities using an IR camera. EPA inspectors evaluated compliance with the Fort Berthold FIP at six oil and natural gas production facilities. EPA inspectors conducted the August 19, 2020, inspections jointly with the Energy Division of the Three Affiliated Tribes of the Mandan Hidatsa and Arikara Nations.

115.    Inspectors observed and documented unlawful emissions at one of the six well pads evaluated. 40 C.F.R. § 49.4165(b). The one facility where inspectors observed emissions is listed in Table 3.

| Table 3. Marathon Facilities with Violations Observed During Inspections on August 19, 2020 ||
| Facility Name | Emissions Observed |
| --- | --- |
| Oates 21-27H and Senness 11-27 TFH | Emissions from thief hatch on top of storage tank |

116.    In its annual reports for calendar years 2015 (dated August 15, 2016), 2016 (dated August 15, 2017), 2017 (dated August 16, 2018), and 2018 (dated August 15, 2019), Marathon reported additional cases where operation was not performed in compliance with the requirements specified in 40 C.F.R. §§ 49 .4164 and 49.4165 at oil and natural gas production facilities. The self-reported violations involved 60 facilities where emissions were identified for failure to route vapors to a control device and/or thief hatches were not properly sealed.

**D.  Section 114 Information Requests**

117.    EPA issued multiple information requests under Section 114 of the Act, 42 U.S.C. § 7414(a)(1), to Marathon to evaluate compliance with the Act at the Facilities.

118.    On July 23, 2015, EPA issued a CAA Section 114 Design Request ("2015 Design Request") for information regarding the adequacy and design of Marathon's VCSs to handle emissions. Marathon provided extensive information that revealed that VCSs covered by the Design Information request were inadequately designed and sized, and would therefore have

uncontrolled emissions escaping to the atmosphere from storage vessel PRDs.

119.    EPA issued additional Section 114 Requests on July 23, 2015, April 15, 2021,

November 22, 2021, and May 10, 2022. These requests sought information related to design,

operation, and maintenance of Marathon's facilities, Part 2 registration information and

communications, and facility construction and modification dates.

120.    The Section 114 Requests also requested installation of flow meters and pilot light

monitoring at certain facilities.

121.    Results of the flow meter monitoring Section 114 Request revealed that marathon

under-reported the volumes of its high-pressure flare gas volumes by an average of 59%, when

compared to data reported by Marathon to NDIC.

### E.  Marathon's Potential to Emit Calculations in Part 2 Registrations Submitted Under the Tribal Minor NSR Rule

122.    Marathon has submitted dozens of Part 2 registrations to EPA under the Tribal

Minor NSR Rule.

123.    By submitting the Part 2 registrations to EPA, Marathon registered the associated

facilities as true minor oil and natural gas sources.

124.    In each of its Part 2 registrations, Marathon asserted that the associated facility's

potential to emit for both VOCs and CO was below the PSD threshold of 250 tpy.

125.    For the facilities identified in Appendices B and C, Marathon based the potential

to emit calculations provided in its Part 2 registrations on inaccurate and unsupported

assumptions.

126.    Marathon's inaccurate and unsupported assumptions include:

(a) Unreasonably low flaring estimates for the first year of production. For

many facilities, flaring reported by Marathon to NDIC was orders of

magnitude higher than the assumed amount in Marathon's Part 2

registration;

(b) Unreasonably low estimates for the amount of oil produced in the first

year of production. For some facilities, the amount of oil produced

reported by Marathon to NDIC was significantly higher than the

maximum production assumed in Marathon's Part 2 registration;

(c) Improper assumption that the treater gas flare would achieve a 99%

destruction efficiency. There is neither a federally enforceable

requirement to achieve 99% destruction efficiency, nor can the flare

achieve a 99% destruction efficiency in real world conditions. Therefore

99% destruction efficiency is not appropriately included in the potential

to emit calculation. *See* 40 C.F.R. § 52.21(b)(4);

(d) Unsupported site-specific inputs for VOC flash gas emission factors,

VOC molecular weights, and VOC weight percentages. Each of these

inputs were lower than North Dakota default inputs; and

(e) Unsupported emission factors for CO.

127.    Marathon's use of inaccurate and unsupported assumptions in its emission

calculations reduced its calculated potential to emit VOC and CO emissions to below applicable

permitting thresholds.

128.    EPA recalculated Marathon's VOC and CO emissions using Marathon's

submitted Part 2 registrations, information reported by Marathon to NDIC, and information

submitted by Marathon to EPA in response to EPA's CAA Section 114 Requests.

129.    Based on the recalculations, EPA determined that Marathon exceeded Title V

threshold of 100 tpy of either CO or VOC emissions (or both) at the 38 facilities identified in Appendix B.

130.    Based on the recalculations, EPA determined that Marathon exceeded the PSD threshold of 250 tpy of either VOC or CO emissions (or both) at the 24 facilities identified in Appendix C.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Violations of Fort Berthold FIP)

131.    The preceding paragraphs are incorporated herein by reference.

132.    The Fort Berthold FIP applies to oil and natural gas production facilities with one or more oil and natural gas wells, for any one of which completion or recompletion operations are or were performed on or after August 12, 2007. 40 C.F.R. § 49.4161(b). Compliance with the Fort Berthold FIP is required no later than June 20, 2013, or upon initiation of well completion operations or well recompletion operations, whichever is later. 40 C.F.R. § 49.4161(c).

133.    Each of the 66 Marathon facilities listed in Appendix A constitutes an "oil and natural gas production facility" within the meaning of the Fort Berthold FIP because the facilities are "one or more oil and natural gas wells that are necessary for production operations and storage operations." 40 C.F.R. § 49.4163(a)(11).

134.    Each of Marathon's well pads listed in Appendix A produced oil and/or natural gas from the Bakken Formation in North Dakota.

135.    Each of Marathon's well pads in Appendix A contains one or more natural gas wells that was completed or recompleted after August 12, 2007.

136.    As oil and natural gas production facilities located on the Fort Berthold Indian Reservation, with one or more wells completed or recompleted after August 12, 2007, and

producing from the Bakken Formation, Marathon's well pads listed in Appendix A, are subject to the requirements of the Fort Berthold FIP.

137.    The Fort Berthold FIP requires each owner or operator of an oil and natural gas production facility to submit an annual report to the EPA on August 15 of every year. 40 C.F.R. § 49.4168(b). The report must include "[a] summary of cases where construction or operation was not performed in compliance with the requirements specified in §49.4164, 49.4165, or §49.4166 for each oil and natural gas well at each oil and natural gas production facility, and the corrective measures taken." 40 C.F.R. § 49.4168(b)(4)(iii).

138.    As set forth in Appendix A, for calendar years 2015, 2016, 2017, and 2018, Marathon self-reported violations of the Fort Berthold FIP in accordance with 40 C.F.R. § 49.4168(b)(4)(iii).

139.    As set forth in Appendix A, during the 2015, 2019, and 2020 inspections of Marathon's facilities, EPA observed hydrocarbon emissions, including VOCs, with an IR camera.

140.    Marathon constructed certain well pads without first performing a formal engineering design analysis to determine if the VCSs would route all storage vessel vapors to an emissions control device. *See* Appendix A.

141.    The VCSs installed at certain Marathon well pads did not convey all vapors from the storage vessels to control devices. Some or all the vapors were, instead, emitted directly to the atmosphere through thief hatches and/or other points on the VCSs. *See* Appendix A.

142.    Based upon Marathon's self-reporting of violations submitted in annual reports for calendar years 2015, 2016, 2017, and 2018, and the observation of hydrocarbon emissions, including VOCs, with an IR camera during EPA's 2015, 2019, and 2020 inspections, Marathon

violated the following Fort Berthold FIP requirements for at least the 67 facilities, as set forth in Appendix A1:

(a)  Each owner or operator must operate and maintain all liquid and gas collection, storage, processing and handling operations, regardless of size, so as to minimize leakage of natural gas emissions to the atmosphere. 40 C.F.R § 49.4164(a);

(b)  Each owner or operator must equip all openings on each produced oil storage tank and produced water storage tank interconnected with produced oil storage tanks with a cover to ensure that all natural gas emission are efficiently being routed through a closed-vent system to a vapor recovery system, an enclosed combustor, a utility flare, or a pit flare. 40 C.F.R. § 49.4165(a). Each cover and all openings on the cover (e.g., access hatches, sampling ports, PRV, and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the produced oil and produced water in the storage tank. 40 C.F.R. § 40.4165(a)(1);

(c)  Each closed vent system must route all produced natural gas and natural gas emissions from production and storage operations to the natural gas sales pipeline or the required control devices. *Id.* at § 49.4165(b)(1);

(d)  All vent lines, connections, fittings, valves, relief vales, or any other appurtenance employed to contain and collect natural gas, vapor, and fumes and transport them to a natural gas sales pipeline and any VOC control equipment must be maintained and operated properly at all times.

> *Id*. at § 49.4165(b)(2); and

(e) The owner or operator must ensure that each utility flare is designed and operated in accordance with the requirements of 40 CFR 60.18(b) for such flares, except for § 60.18(c)(2) and (f)(2) for those utility flares operated with an electronically controlled automatic igniter. *Id.* at § 49.4165(c)(4).

143.   Unless restrained by an Order of this Court, these and similar violations will continue.

144.   As provided in Section 113(b) of the CAA, Marathon is subject to injunctive relief and civil penalties of up to $37,500 per violation for each day of violation that occurred before November 2, 2015, and $117,468 per violation for each day of violation that occurred after November 2, 2015. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

**SECOND CLAIM FOR RELIEF**
**(Violations of NSPS Subparts OOOO & OOOOa)**

145.   The preceding paragraphs are incorporated herein by reference.

**NSPS Subpart OOOO**

146.   Marathon constructed, modified, or reconstructed storage vessels at the 19 facilities identified in Appendix A2 as subject to NSPS Subpart OOOO (the "Subpart OOOO Facilities") after August 23, 2011, and on or before September 18, 2015. 40 C.F.R. § 60.5365.

147.   Based on the well production data reported by Marathon to NDIC, each Subpart OOOO Facility is a single storage vessel with the potential for VOC emissions equal to or greater than 6 tpy.

148.   Based on the date that Marathon commenced construction, modification or reconstruction, and well production data reported to NDIC, the Subpart OOOO Facilities constitute oil and natural gas production facilities that are subject to the standards for storage

vessel affected facilities in NSPS Subpart OOOO. 40 C.F.R. § 60.5395.

149.     Based upon Marathon's annual reports submitted to EPA for calendar years 2015, 2016, 2017, and 2018, and EPA's observation of hydrocarbon emissions, including VOCs, with the IR camera in its 2015, 2019, and 2020 inspections, Marathon violated the following NSPS Subpart OOOO requirements for at least 19 of its facilities, as set forth in Appendix A2:

(a)     The cover and all openings on the cover (e.g., access hatches, sampling ports, [PRVs] and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the liquid in the storage vessel or wet seal fluid degassing system. 40 C.F.R. § 60.5411(b)(1);

(b)     Each cover opening shall be secured in a closed, sealed position (e.g. covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed except during those times when it is necessary to use an opening. *Id.* at § 60.5411(b)(2);

(c)     Each storage vessel thief hatch shall be equipped, maintained and operated with a weighted mechanism or equivalent to ensure that the lid remains properly seated. *Id.* at § 60.5411(b)(3); and

(d)     Closed vent systems must be designed to route all gases, vapors, and fumes emitted from the material in the storage vessel to a control device that meets the requirements specified in [40 C.F.R.] § 60.5411(c) and (d), or to a process. *Id.* at § 60.5411(c)(1).

150.     For Marathon's facilities identified in Appendix A2 that have failed to comply with the storage vessel closed vent system requirements of 40 C.F.R. § 60.5411(c), Marathon also violated and continues to violate the VOC standards for storage vessel-affected facilities at

40 C.F.R. § 60.5395(b)(1).

**NSPS Subpart OOOOa**

151.    Marathon constructed, modified, or reconstructed the storage vessels at the 25 facilities identified in Appendix A3 as subject to NSPS Subpart OOOOa ("Subpart OOOOa Facilities") after September 18, 2015.

152.    Based on the well production data reported by Marathon to NDIC, each Subpart OOOO Facility is a single storage vessel that has the potential for VOC emissions equal to or greater than 6 tpy.

153.    Based on the date that Marathon commenced construction, modification or reconstruction, and well production data reported to NDIC, the Subpart OOOOa Facilities constitute oil and natural gas production facilities that are subject to the standards for storage vessel affected facilities in NSPS Subpart OOOOa. 40 C.F.R. § 60.5395a.

154.    Based upon Marathon's annual reports submitted to EPA for calendar years 2016, 2017, and 2018, and EPA's observation of hydrocarbon emissions, including VOCs, with the IR camera in its 2019 and 2020 inspections, Marathon violated the following NSPS Subpart OOOOa requirements for at least 25 of its facilities, as set forth in Appendix A3:

> (a)     The cover and all openings on the cover (*e.g.*, access hatches, sampling ports, [PRDs] and gauge wells) shall form a continuous impermeable barrier over the entire surface area of the liquid in the storage vessel or wet seal fluid degassing system. 40 C.F.R. § 60.5411a(b)(1);

> (b)     Each cover opening shall be secured in a closed, sealed position (e.g.*, covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed except during those times when it is necessary to use an

opening. *Id.* at § 60.5411a(b)(2);

(c)    Each storage vessel thief hatch shall be equipped, maintained and operated with a weighted mechanism or equivalent, to ensure that the lid remains properly seated and sealed under normal operating conditions, including such times when working, standing/breathing, and flash emissions may be generated. Operators must select gasket material for the hatch based on composition of the fluid in the storage vessel and weather conditions. *Id.* at § 60.5411(b)(3);

(d)    Operators must design the closed vent system to route all gases, vapors, and fumes emitted from the material in the storage vessel affected facility to a control device that meets the requirements specified in [40 C.F.R.] § 5412a(c) and (d), or to a process. *Id.* at § 60.5411a(c)(1); and

(e)    Operators must design and operate a closed vent system with no detectable emissions, as determined using olfactory, visual, and auditory inspections or optical gas imaging inspections as specified in [40 C.F.R.] § 60.5416a(c). *Id.* at § 60.5411(c)(2).

155.    For Marathon's facilities identified in Appendix A3 that have failed to comply with the storage vessel closed vent system requirements of 40 C.F.R. § 60.5411a(c), Marathon also violated and continues to violate the VOC standards for storage vessel-affected facilities at 40 C.F.R. § 60.5395a(b)(1).

156.    Each of the violations alleged in this claim are violations of Section 111(e) of the CAA, 42 U.S.C. § 7411(e).

157.    Unless restrained by an Order of this Court, these and similar violations will continue.

158.     As provided in Section 113(b) of the CAA, Marathon is subject to injunctive relief and civil penalties of up to $37,500 per violation for each day of violation that occurred before November 2, 2015, and $117,468 per violation for each day of violation that occurred after November 2, 2015. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

**THIRD CLAIM FOR RELIEF**
(Failure to Comply with PSD Major Source Permitting Requirements
for VOC and CO Emissions)

159.     The preceding paragraphs are incorporated herein by reference.

160.     The 24 facilities listed in Appendix B are within the exterior boundaries of the FBIR and therefore on an Indian reservation in the State of North Dakota whose approved SIP incorporates the federal PSD regulations.

161.     The 24 facilities owned and/or operated by Marathon identified in Appendix B emit or have the potential to emit 250 tpy or more of VOC, a regulated NSR pollutant.

162.     15 of the 24 facilities identified in Appendix B are new wells that Marathon added to existing well pads, as identified in Appendix B. The remaining 9 facilities listed in Appendix B are new well pads.

163.     Marathon's construction of the new wells at 15 existing facilities are physical changes to those sources that, by themselves, caused the facilities to exceed 250 tpy. *See* Appendix B.

164.     Each of the 24 facilities identified in Appendix B constitute a "major emitting facility" and "major stationary source" of VOC for purposes of the PSD program.  42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(b) and (c).

165.     In addition, 17 of the 24 Marathon facilities identified in Appendix B each constitute a "major emitting facility" and "major stationary source" of CO for purposes of the PSD program. *See* 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i)(b) and (c).

166.     Marathon constructed all 24 major stationary sources listed in Appendix B without first obtaining a PSD permit for the construction and operation of the source. 42 U.S.C. § 7475(a)(1); 40 C.F.R. § 52.21(a)(2)(iii).

167.     Marathon started construction of all 24 major stationary sources listed in Appendix B without undergoing a BACT determination for VOC in relation to the source. 42 U.S.C. § 7475(a)(4); 40 C.F.R. § 52.21(j).

168.     Marathon started construction of at least 17 of the 24 major stationary sources listed in Appendix B without undergoing a BACT determination for CO in relation to the construction. 42 U.S.C. § 7475(a)(4); 40 C.F.R. § 52.21(j).

169.     Marathon failed to install and operate BACT for the control of VOC emissions in compliance with BACT limitations for at least the 24 major stationary sources identified in Appendix B. 42 U.S.C. §§ 7475(a)(1)-(3). 40 C.F.R. § 52.21(j).

170.     Marathon failed to install and operate BACT for the control of CO emissions in compliance with BACT limitations for at least 17 of the 24 major stationary sources identified in Appendix B. 42 U.S.C. §§ 7475(a)(1)-(3). 40 C.F.R. § 52.21(j).

171.     Marathon has never obtained a PSD permit for any of the 24 major stationary sources identified in Appendix B. 42 U.S.C. § 7475(a)(1); 40 C.F.R. § 52.21(a)(2)(iii).

172.     Marathon violated and continues to violate Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the federal PSD regulations at 40 C.F.R. § 52.21, for at least each of the 24 facilities identified in Appendix B.

173.     For at least 17 of the 24 Marathon facilities listed in Appendix B, Marathon's failure to obtain a PSD permit with respect to CO constitutes a second, independent basis of violations of Section 165(a) of the Act, 42 U.S.C. § 7475(a) and the federal PSD regulations at

40 C.F.R. § 52.21.

174.    Unless restrained by an Order of this Court, these and similar violations of the Act will continue.

175.    As provided in Section 113(b) of the CAA, Marathon is subject to injunctive relief and civil penalties of up to $117,468 per violation for each day of violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

**FOURTH CLAIM FOR RELIEF**
(Title V Permitting Violations)

176.    The preceding paragraphs are incorporated herein by reference.

177.    Title V applies to any "major stationary source" defined as a "facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tpy or more of any air pollutant." 42 U.S.C. § 7602(j).

178.    Each of the 38 facilities owned and/or operated by Marathon identified in Appendix C have actual emissions or potential to emit greater than 100 tpy of VOC and/or CO, and are each therefore a "major stationary source" as defined by 42 U.S.C. § 7602(j), and subject to the Title V permitting requirements under 40 C.F.R. Part 71. 40 C.F.R. § 71.3(a)(1).

179.    The 38 facilities listed in Appendix C are located within the exterior boundaries of the FBIR. EPA, therefore, administers and enforces the Title V permit program for the 38 facilities. 40 C.F.R. § 71.4(b).

180.    Title V sources are required to apply for an operating permit "within 12 months after commencing operation or on or before such earlier date as the permitting authority may establish." 40 C.F.R. § 71.5(a)(1)(i).

181.    For at least 36 of the 38 facilities listed in Appendix C, Marathon failed to timely submit an accurate and complete application for Title V permits to the EPA within 12 months

after the sources became subject to the permit program (i.e., within 12 months of the date that the source began producing).

182.     Upon the date of this Complaint, Marathon has failed to submit any Title V application for at least two of the 38 facilities listed in Appendix C.

183.     For at least the 24 facilities listed in Appendix C that are subject to PSD requirements, Marathon's failure to list PSD permits as an applicable requirement and failure to set forth accurate emissions numbers and limitations constitutes a failure to set forth all applicable requirements that apply to a source regulated under the Act within a Title V permit.

184.     Marathon has continued to operate all 38 facilities after 12 months of the first date of production.

185.     Marathon therefore violated or continues to violate Sections 502(a), 503(c), and 504(a) of the Act, 42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a), and the Title V implementing regulations at 40 C.F.R. part 71 for at least the 38 facilities listed in Appendix C.

186.     Unless restrained by an Order of this Court, these and similar violations will continue.

187.     As provided in Section 113(b) of the CAA, Marathon is subject to injunctive relief and civil penalties of up to $117,468 per violation for each day of violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the above allegations, Plaintiff requests that this Court:

A.     Permanently enjoin Defendant from further violating the CAA and its implementing regulations;

B.     Order Defendant to take appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA and its

implementing regulations;

C.      Assess a civil penalty against Defendant for each violation of the CAA and its

implementing regulations;

D.      Award Plaintiff its costs and disbursements for this action; and

E.      Grant such other and further relief as the Court deems just and proper.


Respectfully submitted,


TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


*/s/ Vanessa M. Moore*
VANESSA M. MOORE
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-532-3067
Vanessa.Moore@usdoj.gov


LAURA A. THOMS
Assistant Section Chief
JONAH P. BROWN
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044